**FOR PUBLICATION**

**UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF CALIFORNIA**

In re: UMESH PATEL and LEE           )          Case No. 09-39791-C-11
PATEL,                               )
                        Debtors.     )          Dkt. Control No. RPG-1
_____      )

**OPINION ON MOTION TO CONVERT OR DISMISS CHAPTER 11 CASE**

**Before: Christopher M. Klein, Bankruptcy Judge**
_____

Marc C. Forsythe, Robert P. Goe, Goe & Forsythe, LLP, Irvine, CA, for 1332 Broadway Note LLC.

Timothy T. Huber, Law Offices of Timothy T. Huber, El Dorado Hills, CA, for Revested Debtors.
_____

CHRISTOPHER M. KLEIN, Bankruptcy Judge:

The individual debtors' chapter 11 plan committed all their "disposable income as defined in 11 U.S.C. § 1129(a)(15)(B)" to pay the unsecured class for 84 months. No such payments were made. At the end of the plan term, an unsecured creditor invoked the plan's default provision to request conversion or dismissal. The question is whether there ever was actual "disposable" income. Who has what burdens governs the outcome.

When a debtor promises all actual "disposable" income in a chapter 11 plan and undertakes to act as plan disbursing agent, the debtor assumes the burden of a duty to account — either by contract or as a fiduciary. Failure to account is a material plan default within the meaning of § 1112(b)(4)(N), hence, § 1112(b)(1) "cause." Here, conversion to chapter 7 is in the best interests of creditors and the estate.

## Findings of Fact[1]

Debtors Umesh and Lee Patel commenced this joint chapter 11 case in 2009 to save from foreclosure their 45-unit motel, the Gold Country Inn in Placerville, California, and confirmed a chapter 11 plan in 2011.[2]

Wells Fargo Bank, N.A. ("Wells Fargo") held the senior note and deed of trust, which it assigned to movant 1332 Broadway Note, LLC, in 2015.

### A. Chapter 11 Plan and Performance

Until plan confirmation on September 19, 2011, the Debtors leased the motel to their wholly-owned S corporation, Eureka Investment Group, Inc., which employed them. Under the Plan, they terminated the lease and became sole proprietors.[3]

---

[1]These findings of fact are made pursuant to Federal Rule of Civil Procedure 52, as incorporated by Federal Rules of Bankruptcy Procedure 7052 and 9014, after a multi-day trial.

[2]The Debtors also owned a residence in Eureka, California, that was given up to foreclosure early in the case.

[3]The Disclosure Statement explained:

> The Debtors will terminate the lease between Debtors and their wholly owned S Corporation, EIG, for the operation of the Motel. There should be no repercussions since EIG has been in default of the lease terms since early 2009.

Debtors' Second Amended Disclosure Statement, ¶ III-F. Dkt. 162 ("Disclosure Statement").

The Plan provides:

> On the Effective Date, the Debtors shall terminate the EIG lease for its default under its terms.

Debtors' Second Amended Plan of Reorganization, ¶ III-A-1. Dkt. 161 ("Plan").

Deed of trust claims included Wells Fargo for $1,630,061, followed by Resource Capital for $1,124,000.

By agreement, the motel was valued at $1,200,000. Thus, the Wells Fargo claim was bifurcated to $1,200,000 secured and $430,061 unsecured. Resource Capital's $1,124,000 claim was all unsecured. They amount to 82 percent of all unsecured class.

The Plan provides for Wells Fargo to retain its lien, with its $1,200,000 secured claim paid by 84 monthly payments of $9,303.59, at 7.0 percent interest, followed by a balloon payment of $951,214.63 due on September 1, 2018.

The unsecured class would be paid all disposable income as defined in § 1129(a)(15) for the 84 months of the Plan. Payments would be quarterly, commencing January 1, 2012.[4]

The Debtors represented in their Disclosure Statement that the motel constituted their "only sources of income" and that the means for Plan implementation would be from motel operations.[5]

---

[4]Specifically: "Debtors will make payments to unsecured creditors of 100% of the Debtors' disposable income as defined in 11 U.S.C. § 1129(a)(15)(B) of the Bankruptcy Code (the "Disposable Income"), by using revenue from Debtors' continued operation of the Motel as a going concern." Plan, Introduction.

Further: "Total amt of [unsecured] claims $1,873,397 including Resource Capital and WFB unsecured amounts; Pymt interval Quarterly; Pymt amt Varies; Begin date 1/1/2012; End date 9/1/2018; Interest rate 0%; Total payout Unknown based on 100% of Disposable Income." Plan, ¶ II-C-3.

[5]Income: "The Debtors' only sources of income are the salary paid to them as the day to day operating managers of the Motel, S Corporation distributions from EIG, if any, and the rent paid by EIG under the operating lease." Disclosure Statement, ¶ II-A.

Means of Implementing Plan: "Payments and distributions under the Second Amended Plan will be funded by the cash flow of revenues obtained by the Debtors in excess of operating expenses from the operation of the Motel as a going concern, as well as

1    The Debtors agreed to restrict themselves to a $30,000/yr,

2  salary together with use of the on-site manager's apartment.

3  They explained they had a wealth of motel management experience

4  and could not hire managers for such a modest amount.[6]

5    Upon default, the Plan contemplates a motion to convert or

6  dismiss and, if converted to chapter 7, provides for all

7  remaining property that was property of the estate to revest in

8  the chapter 7 estate and be protected by the automatic stay.[7]

9  _____

10 the $48,672.72 in cash reserves held in trust during the course
   of this proceeding as set forth in Exhibit G." Id., ¶ III-D-1

11    [6]Post-confirmation management:

12      The Debtors, as Post-Confirmation Managers of the
13      Debtors, shall be compensated at a set amount of $30,000 per
        year, plus the managers' apartment, which are included in
14      the operating expenses.

15 Disclosure Statement, ¶ III-D-2.

16      The Debtors, as Post-Confirmation Managers of the
        Motel, shall be compensated with a salary of $30,000 plus
17      use of the manager's apartment for 24/7/365 management
        services of the Motel.  This level of compensation is
18      substantially less than the cost for third party employees
        to provide that many hours of management.  The Debtors have
19      many years of experience in operating independent motel
        properties such as the Motel.
20

21 Plan, ¶ II-D-2.

22    Although projections attached to the Plan indicate pay
   increases, Umesh Patel testified in state court in 2018 that "I
23 am not allowed by the court approved Plan to receive any
   compensation from the motel in excess of $30,000."  Compare
24 Declaration of Umesh Patel, March 6, 2018, with Plan, Ex. 3.

25    [7]Post-Confirmation Conversion/Dismissal:

26      A creditor or party in interest may bring a motion to
27      convert or dismiss the case under § 1112(b), after the Plan
        is confirmed, if there is a default in performing the Plan.
28      If the Court orders the case converted to Chapter 7 after
        the Plan is confirmed, then all property that had been

4

The Revested Debtors undertook to act as Plan disbursing agent,[8] and obliged themselves to make quarterly disbursements and regular 120-day status reports for the 84-month life of the Plan ("120-day Plan reports"), which reports were to be served on the twenty largest unsecured creditors.[9] United States trustee quarterly reports were also required while the case was open.

No discharge may be entered before completion of all payments under the Plan.[10]

---

property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate, and the automatic stay will be reimposed upon the revested property only to the extent that relief from stay was not previously granted by the Court during this case.

Plan, ¶ IV-F.

[8]The paragraph "Disbursing Agent" provides:

Debtors shall act as the disbursing agent for the purpose of making all distributions provided for under the Plan. The Disbursing Agent shall serve without and shall not be compensated [for] distribution services rendered pursuant to the Plan.

Plan, ¶ II-D-3.

[9]The paragraph "Post-Confirmation Status Report" provides:

Within 120 days of the entry of the order confirming the Plan, Plan Proponent shall file a status report with the Court explaining what progress has been made toward consummation of the confirmed Plan. The status report shall be served on the United States Trustee, the twenty largest unsecured creditors, and those parties who have requested special notice. Further status reports shall be filed every 120 days and served on the same entities.

Plan, ¶ IV-D.

[10]The discharge provision is:

This Plan provides that upon completion of all payments under the Plan, Debtors shall be discharged of liability for payment of debts incurred before confirmation of the Plan,

Although required every 120 days for the 84-month life of the Plan, the status reports ceased after month 24 (as of September 30, 2013). There has been no explanation why the Revested Debtors stopped making their 120-day Plan reports.

Quarterly post-confirmation status reports required by the United States trustee were filed through September 30, 2014, and ceased when the case was closed subject to being reopened for entry of discharge upon completion of the Plan.

In 2015, Wells Fargo assigned 1332 Broadway Note, LLC, its note and deed of trust, hence its secured and unsecured claims.

Although the 84 monthly payments on account of the Wells Fargo secured claim appear to have been made, the $951,214.63 balloon payment due on September 1, 2018, was not made.[11]

No payment ever was made to Class V unsecured creditors during the 84-month term of the Plan. The failure to have made any payment on unsecured claims precipitated the instant motion to dismiss or convert on account of Plan default on the premise that there must have been at least some disposable income.

## B. Income

The Debtors' defense to this motion to dismiss or convert is that there never was "disposable income" available to make payments to the unsecured class.

---

to the extent specified in 11 U.S.C. § 1141. However, any liability imposed by the Plan will not be discharged. Plan, ¶ IV-A.

[11]Umesh Patel has instituted separate litigation seeking to forestall attempts to foreclose on account of the failure to have made the balloon payment.

The seven 120-day Plan reports that were made each reported no disposable income during the relevant periods and that no problems were anticipated in plan performance.[12]  No 120-day Plan report was made for any period after September 30, 2013.

The twelve Quarterly Post-confirmation Status Reports to the United States trustee that were filed by the Revested Debtors show receipts and disbursements.  Nine of those reports appended more detailed profit and loss statements for motel operations.

| Dkt | End Date | Received | Disbursed | Net | Profit/(Loss) |
|-----|----------|----------|-----------|-----|---------------|
| 184 | 12/31/11 | $58,580 | $82,938 | $(24,358) | none provided |
| 186 | 3/31/12 | 93,904 | 74,229 | 19,675 | none provided |
| 195 | 6/30/12 | 61,782 | 72,226 | (10,444) | none provided |
| 214 | 9/30/12 | 99,535 | 110,376 | (10,841) | $(20,841) |
| 223 | 12/31/12 | 74,538 | 109,877 | (35,339) | (35,338) |
| 228 | 3/31/13 | 31,439 | 61,298 | (29,859) | (29,805) |
| 231 | 6/30/13 | 96,904 | 89,936 | 6,968 | 7,002 |
| 234 | 9/30/13 | 82,581 | 73,668 | 8,913 | 8,916 |
| 235 | 12/31/13 | 82,032 | 106,145 | (24,113) | (24,111) |
| 236 | 3/31/14 | 67,320 | 60,649 | 6,671 | 6,930* |
| 237 | 6/30/14 | 89,394 | 74,886 | 14,508 | 14,507 |
| 240 | 9/30/14 | 138,762 | 74,034 | 64,728 | 64,728 |

---

[12]Each report includes the following statements:

> No payments have accrued at this time for the benefit of the class of Unsecured Creditors, since Revested Debtors have received no "Disposable Income" from which that class is entitled to be paid.
> Revested Debtors remain in a cash positive position due to savings accumulated prior to the commencement of payments under the Plan and do not anticipate any problems with performance of the Plan.

Revested Debtors' Status Report, p.2.  Dkt. 185 (1/17/2012); Dkt. 187 (4/19/2013); Dkt. 194 (7/20/2012); Dkt. 224 (2/1/13); Dkt. 227 (4/17/2013); Dkt. 230 (7/15/2013); Dkt. 233 (10/19/2013).

The first status report also notes: "To conserve cash, Revested Debtors have only received $1,500 during this quarter against the manager's salary of $2,500 per month called for under the Plan, Revested Debtors are accruing that obligation to be paid when cash flow permits."  Id., p.2. Dkt. 185 (1/17/2012).

Totals:        $976,771  $990,262   $(13,491)  $(8,512)*
                    *(3/31/14 Profit/Loss omits $32,500 in receipts)

        Between April 1, 2013, and September 30, 2014, receipts
exceeded disbursements by $77,675.  Profits were $77,972.  No
quarterly Plan Class V disbursements were made.

        Motel operations for 2015, 2016, and 2017 yielded net
profits of $286,333, exclusive of depreciation, or, if adjusting
for depreciation, $98,121, evidence of which is derived from
Umesh Patel's federal tax returns.[13]  No quarterly Plan Class V
disbursements were made.

        Those tax returns also reveal income from sources other than
motel operations, including ordinary dividend income of $5,056 in
2015 and $4,721 in 2017.

        Umesh Patel managed to fund a $50,000 Roth IRA account
between 2012 and 2018.

        And, he was trading in financial markets.  Umesh Patel
opened Scottrade brokerage account No. XXXXX995 in 2012.  In the
"Options Application & Agreement," dated March 12, 2012, he
stated: annual income, $80,000; net worth $150,000; and liquid
assets $50,000.  He had an unreported Scottrade account in 2010,

_____

        [13]Umesh Patel's Federal Tax Forms 1040, Schedule D (Profit
or Loss from Business - Sole Proprietorship) show:
        2015 – net profit $8,083 (gross receipts $317,611, gross
income $269,390, and total expenses $261,307, including
depreciation $60,767);
        2016 – net profit $15,217 (gross receipts $311,512, gross
income $291,312, and total expenses $276,095, including
depreciation $60,316);
        2017 - net profit $74,821 (gross receipts $432,526, gross
income $386,474, and total expenses $311,653, including
depreciation $67,129).

1  when he was a debtor in possession.[14]

2       Scottrade account No. XXXXX995 statement for January 2014

3  shows credits of $112,206.05 and debits of $66,551.43.

4       During the Plan period, Umesh Patel opened Ameritrade

5  brokerage account No. XXX-XXX331, to purchase stocks on margin.

6       The Ameritrade statement for August 2018 shows year-to-date:

7  securities purchases $2,627,970.74; sales $2,912,589.66;

8  dividends $3,958.39; and margin interest $3,589.81.

9       Investment activity is reflected on the Umesh Patel federal

10  tax Forms 1040, Schedule D, for 2015, 2016, and 2017.[15]

11       Umesh Patel admits that between 2011 and 2018 he lost at

12  least $339,000 in the stock market.  His expert, Norman Johnson

13  says losses were $372,800.

14       No investment account was disclosed to the class of

15  unsecured creditors by Umesh Patel during the 84-month Plan.

16

17                    C. Developments Regarding Debtors

18       Umesh and Lee Patel divorced in an action filed June 22,

19  2012, in El Dorado County Superior Court as No. PFL 20120518.

20  The 120-day Plan reports filed in 2012 noted the existence of the

21  

22       [14]In the 2013 divorce of Umesh and Dipti Patel, Umesh
reported a Scottrade deposit account acquired in 2010 with

23  $21,000 and a Scottrade Roth IRA of $23,000 acquired in 2014.
Petitioner's Schedule of Assets and Debts, Umesh Patel v. Dipti

24  Patel, No. PFL20130940, El Dorado County Superior Court.

25       [15]The returns in evidence show:  2015 – short-term capital
loss $63,430 (proceeds $500,244, cost $563,674), plus a $4,377

26  loss carryforward from 2014; 2016 – short-term capital gain $240
(proceeds $840, cost $600), plus long-term capital loss $5,781

27  (proceeds $32,431, cost $38,212); 2017 – short-term capital loss
$59,738 (proceeds $102,449, cost $162,187), plus long-term

28  capital loss $80,549 (proceeds $176, cost $80,549).

divorce and that Lee Patel intended to quitclaim to Umesh Patel her interest in the motel. She then disappears from the case.[16]

Umesh Patel soon remarried. In 2013, he was Petitioner in the marital dissolution action, Umesh Patel v. Dipti Patel, No. PFL 20130940, in El Dorado County Superior Court.

Umesh Patel next married Suhkwinder K. Randhawa Patel in 2017. In the ensuing marital dissolution action, Umesh claimed that when she left in November 2017, she stole from him gold and diamond jewelry that he valued at $60,000.[17] If the schedules filed at the inception of the case are truthful, then this $60,000 is property acquired after commencement of the case.[18]

---

[16]The post-divorce status of Lee Patel as joint debtor and a Revested Debtor can be resolved after conversion to chapter 7.

[17]Umesh Patel's declaration testimony in state court was:

> While most of the receipts are by credit card, I do receive cash payments on occasion. My routine is to keep cash in pouch along with an itemized statement of the cash receipts. On November 27, 2017, I discovered that the cash pouch was missing. I asked the Respondent if she had seen it, but she denied seeing it. I believe the pouch had $13,000 or so in it at that time.
> About the same time, I inspected a box kept in a dresser in my room that contained gold jewelry and diamond watches and bracelets that were my separate property obtained long before this marriage of eight months. This jewelry is worth about $60,000.

Attachment 10 to Declaration of Umesh Patel, Responsive Declaration to Request for Order, Umesh Patel v. Sukhwinder K. Randhawa Patel, No. PFL20170902, El Dorado County CA. Super. Ct., March 6, 2018 ("Umesh Patel Declaration Attachment 10").

[18]No such property appears in Schedule B(Personal Property):

Item 5 - ... art objects; ... or collectibles: "none"
Item 7 - Furs and jewelry: "none"
Item 35 - Other personal property of any kind not already listed: "none."

On October 10, 2018, Umesh Patel purchased a 2018 Tesla Model 3 for $71,049.50, making a down payment of $11,023.50.

### Procedure

1332 Broadway Note, LLC, as holder of the assigned Wells Fargo $430,061 unsecured claim, invoked the Plan's default provision to prosecute this motion to convert or dismiss under § 1112(b) on the theory that it was a default never to have made a payment to the unsecured class.

At trial, this court listened carefully to the testimony of Umesh Patel defending his financial transactions and did not find it credible.  Nor was his expert helpful.

### Jurisdiction

Jurisdiction is founded upon 28 U.S.C. § 1334(a).  A motion under 11 U.S.C. § 1112(b) to convert or dismiss a chapter 11 case is a core proceeding that a bankruptcy judge may hear and determine.  28 U.S.C. §§ 157(b)(2)(A) & (L).

### Analysis

Analysis begins with rules of construction and applicable law before venturing into the shifting sands of burdens.

I

Confirmed chapter 11 plans are construed as contracts in the manner of consent decrees, which have elements of both judgment

and contract.  Hillis Motors, Inc. v. Haw. Auto. Dealers' Ass'n, 997 F.2d 581, 588 (9th Cir. 1993); Pioneer Liquidating Corp. v. United States Tr. (In re Consol. Pioneer Mortg. Entities), 248 B.R. 368, 375 (9th Cir. BAP 2000), aff'd, 264 F.3d 803 (9th Cir. 2001) ("Consolidated Pioneer"); Dragnea v. Dragnea (In re Dragnea), 609 B.R. 239, 250-51 (Bankr. E.D. Cal. 2019).

### A

The federal rule of decision for construing contract terms in chapter 11 plans is to rely on state law where, as here, there is no need for a uniform federal rule on the question.  Hillis Motors, 997 F.2d at 588; Dragnea, 609 B.R. at 250-51.

California law controls this Plan.  The Plan is silent about choice of law.  The Debtors reside in California, all property is located in California, and venue of the case is in California.

### B

California contract law is governed by its Civil Code, not common law.  CAL. CIV. CODE §§ 1635-63; Dragnea, 609 B.R. at 247.

Civil Code provisions relevant here relate to ambiguous or uncertain terms.  The promisor's belief of what the promisee understood at the time of contracting controls.  CAL. CIV. CODE § 1649.[19]  If uncertainty persists, language shall be interpreted

---

[19]The provision is:

§ 1649. If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it.

"most strongly" against the party who caused the uncertainty. CAL. CIV. CODE § 1654.[20]  In essence, the California Civil Code is consistent with the familiar common-law rule.[21]

As the Plan was drafted and proposed by the Debtors, ambiguities and uncertainties are construed against them.

## II

Multiple points of uncertainty emanate from the Plan promise to pay unsecured creditors:  "100% of the Debtors' disposable income as defined in 11 U.S.C. § 1129(a)(15)(B) (the "Disposable Income"), by using revenue from Debtors' continued operation of the Motel as a going concern."  Plan, Introduction & ¶ II-C-3.

What is certain is that, as a matter of law, a "disposable income" plan payment based on § 1129(a)(15)(B) means <u>actual</u> disposable income, even though the plan confirmation standard at § 1129(a)(15)(B) focuses on <u>projected</u> disposable income.  That

---

CAL. CIV. CODE § 1649.

[20]The provision is:

> § 1654. In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist.

CAL. CIV. CODE § 1654.

[21]The Restatement (Second) of Contracts provides:

> § 206. Interpretation Against the Draftsman
> In choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds.

Restatement (Second) of Contracts § 206 (1981).

conclusion follows from aligning § 1129(a)(15)(B), with

§ 1325(b)(2), and § 101(10A)(ii).[22]

---

[22]The exercise is: § 1129(a)(15)(B) adopts the definition of "projected disposable income" at § 1325(b)(2), which in turn incorporates "current monthly income" from § 101(10A).

The relevant portion of the chapter 11 confirmation standard is:

> (15) [If an unsecured creditor objects to confirmation] —
> ...
> (B) the value of the property to be distributed under the plan is not less than the <u>projected disposable income of the debtor (as defined in section 1325(b)(2))</u> to be received during the 5-year period beginning on the date that the first payment is due under the plan, or during the period for which the plan provides payments, whichever is longer.

11 U.S.C. § 1129(a)(15)(B) (emphasis supplied).

The § 1325(b)(2) "disposable income" definition as of the time of confirmation was:

> (2) For purposes of this subsection, the term "disposable income" means current monthly income received by the debtor [other than child-related payments] less amounts reasonably necessary to be expended —
> (A)(i) for the [family] maintenance or support ... that first becomes payable after ... petition is filed; and
> (ii) for charitable contributions [up to 15 percent of annual gross income]; and
> (B) if the debtor is engaged in business, for the payment of expenditures necessary for the continuation, preservation, and operation of such business.

11 U.S.C. § 1325(b)(2)(2012).

As § 101(10A) existed at the time the Plan was confirmed:

> (10A) The term "current monthly income"--
> (A) means the average monthly income <u>from all sources</u> that the debtor receives (or in a joint case the debtor and the debtor's spouse receive) without regard to whether such income is taxable income, derived during the 6-month period ending on –
> (i) [not applicable here]
> (ii) the date on which current income is determined by the court for purposes of this title if the debtor does not file the schedule of current income required by section

A

The first point of uncertainty is whether the reference to continued operations of the motel is a limitation on the Plan term "Disposable Income" or merely an expression of the then-existing business plan for performing the Plan terms.

Actual "disposable income" under the statutory definition used in the Plan includes, as a matter of law, "income from all sources." But, the Plan and Disclosure Statement could be read to limit "disposable income" to motel revenues.

In their Disclosure Statement, the Debtors said that the motel is their only source of income and that "the cash flow of revenues obtained by the Debtors in excess of operating expenses" would fund the Plan. Disclosure Statement, ¶¶ II-A & III-D-1.

In the Plan Introduction, the Debtors stated they would pay unsecured creditors "100% of the Debtors' disposable income as defined in 11 U.S.C. § 1129(a)(15)(B) of the Bankruptcy Code ("Disposable Income"), by using revenue from Debtors' continued operation" of the motel. The Plan treatment of Class V unsecured claims is "100% of Disposable Income." Plan, ¶ II-C-3. The Means of Performing the Plan are: "Revenues from operations of the Motel will be the source of funding of this Plan, after payment of day to day operating expenses." Plan, ¶ II-D-1.

---

521(a)(1)(B)(ii); and
        (B) includes any amount paid by any entity other than
the debtor ... on a regular basis for the household expenses
of the debtor ... but excludes benefits received under the
Social Security Act [and war crime/terrorism compensation].

11 U.S.C. § 101(10A) (2012) (emphasis supplied).

15

1    Despite emphasizing revenues from motel operations, they
2  expressly incorporated in the Plan the Bankruptcy Code definition
3  of "disposable income," which means income from all sources, net
4  of certain exclusions and deductions.

5    This court finds as fact that, at the time of promising, the
6  promisor Debtors believed that the promisee unsecured creditors
7  would understand the term to mean what the promisors actually
8  said:  "100% of the Debtors' disposable income as defined in 11
9  U.S.C. § 1129(a)(15)(B)," that is, revenue from all sources.

10    Repeated references to motel revenue in the Plan are to be
11  understood not as a limitation on source of payment, but as a
12  representation regarding the then-existing business plan.

13    It follows that the Plan promise of 100% of the Debtors'
14  disposable income is construed to mean revenue from all sources.
15  CAL. CIV. CODE § 1649.

16    The Debtors proposed the Plan.  Lest any uncertainty remain
17  about whether disposable income in the Plan means disposable
18  income from all sources or income only from motel operations, the
19  Plan is construed "most strongly" against the Debtors.  CAL. CIV.
20  CODE § 1654.  Hence, disposable income in the Plan includes
21  income from all sources.

22

23                                  B

24    The next uncertainty relates to the absence of prescribed
25  accounting rules for determining disposable income.  Are loss
26  carryforwards permitted allowing gains in one period to be offset
27  against losses incurred in a prior period?  Is depreciation
28  permitted?  The Plan and the Disclosure Statement are silent.

16

Loss carryforwards make a difference in assessing whether any Class V payments were required from the first three Plan years.  Operating losses of $91,166 were incurred during the first six quarters, which were nearly offset by operating profits of $77,675 in the next six quarters ending September 30, 2014.

Depreciation makes a difference for 2015 through 2017 where tax returns provide the evidence of motel operations.  Profits for those years were $286,333, exclusive of depreciation, or $98,121 after depreciation.

No direct evidence is probative of what the promisor plan proponents thought the promisee Class V creditors believed about loss carryforwards and depreciation at the time of contracting.

The California contract rule requiring construing the Plan "most strongly" against the Revested Debtors casts doubt on loss carryforwards and depreciation.  CAL. CIV. CODE § 1654.


III

As to accounting for Plan payments, the crucial provision is:  "Debtors shall act as disbursing agent for the purpose of making all distributions under the Plan."  Plan, ¶ II-D-3.

The undertaking to act as disbursing agent necessarily implies a correlative duty to account to creditors entitled to distributions under the Plan.

There are two alternative ways of viewing the duties of a revested debtor who assumes the role of disbursing agent under a plan of reorganization:  fiduciary duties and contractual duties.  Either way, it adds up to a duty to account.

17

A

The Debtors acted as fiduciaries in control of the estate during the period they were debtors in possession.  The filing of the chapter 11 case created an estate consisting of all of their legal or equitable interests in property.  11 U.S.C. § 541(a).  As debtors in possession, they performed most of the functions and duties of a chapter 11 trustee.  11 U.S.C. § 1107(a).  One of those duties is to be accountable for all property received.  28 U.S.C. § 704(a)(2), as incorporated by § 1106(a)(1).

1

Thus, it commonly is said that a debtor in possession administers the estate as a fiduciary for the estate's creditors.  E.g., Baker Botts L.L.P. v. ASARCO LLC, 135 S.Ct. 2158, 2163 (2015).  Although details, facets, parameters, beneficiaries, and consequences of debtor-in-possession fiduciary status are subject to debate, at a minimum a debtor in possession is "accountable for all property received" as provided by § 704(a)(2).

Hence, the Debtors were fiduciaries accountable to their creditors for all property so long as they functioned as debtors in possession.  Upon confirmation of the Plan, property of the estate revested in the Debtors.  Plan ¶ IV-B.

2

Ordinarily, termination of debtor in possession status ends fiduciary responsibilities to creditors.  But a chapter 11 plan may provide otherwise.  And, this one did so provide.

The Plan tasked the Debtors with the duty of acting as disbursing agent for distributions to creditors during the Plan's 84-month duration. There being no separate policing mechanism prescribed by Plan, the disbursing agent role entailed determining on a "trust me" basis the amounts of the actual disposable income to be distributed quarterly to the Class V unsecured creditors.

Moreover, property-of-the-estate status lingered in the Plan default provision: "if the Court orders the case converted to Chapter 7 after the Plan is confirmed, then all property that had been property of the Chapter 11 estate, and that has not been disbursed pursuant to the Plan, will revest in the Chapter 7 estate, and the automatic stay will be reimposed." Plan ¶ IV-F.

This "trust me" disbursing agent role of the Revested Debtors in control of a business not subject to independent accounting verification supervision and combined with a prospect of property revesting in a chapter 7 estate has the structural attributes of a trust.

3

Viewed through the prism of trusts, the Plan's disbursing agent structure places the Revested Debtors in the position of settlor and trustee. The trust corpus is the motel business. The Class V unsecured creditors are beneficiaries. The trust terminates either by disbursement to the beneficiaries according to the 84-month term of the Plan or by Conversion to chapter 7. See Consolidated Pioneer, 264 F.3d at 808 (California law).

Because the trust is for the primary purpose of paying debts, it is excluded from the formal definition of "trust" for purposes of California law. CAL. PROBATE CODE § 82(b)(13).

Nevertheless, the principles and procedures of California trust law, California Probate Code §§ 15000-19530, may be applied to an entity or relationship that is excluded from the Probate Code § 82 definition of "trust" when such application of principles and procedures is pursuant to statute, common law, court order or rule, or contract. CAL. PROBATE CODE § 15003(c).[23]

As already noted the confirmed Plan is a hybrid court order and contract governed by California law.

In contrast to California contract law governed by its Civil Code rather than common law, California trust law applies common law except to the extent modified by statute. CAL. PROBATE CODE § 15002;[24] see generally Otto v. Niles (In re Niles), 106 F.3d 1456, 1461 n.4 (9th Cir. 1997) (common law fiduciary duties).

---

[23]Section 15003(c) provides:

> 15003(c). Nothing in this division or in Section 82 is intended to prevent the application of all or part of the principles or procedures of this division to an entity or relationship that is excluded from the definition of "trust" provided by Section 82 where these principles or procedures are applied pursuant to statutory or common law principles, by court order or rule, or by contract.

CAL. PROBATE CODE § 15003(c).

[24]Section 15002 provides:

> 15002. Except to the extent that the common law rules governing trusts are modified by statute, the common law as to trusts is the law of this state.

CAL. PROBATE CODE § 15002.

1     California trustees must account to each beneficiary at
2  least annually. CAL. PROBATE CODE § 16062(a). They also must keep
3  beneficiaries reasonably informed of the trust and its
4  administration. CAL. PROBATE CODE § 16060, <u>accord</u> RESTATEMENT (THIRD)
5  OF TRUSTS § 83 (2007); RESTATEMENT (SECOND) OF TRUSTS § 172 (1959).

6     The reporting requirement of the Plan comports with these
7  duties. Regular reports to unsecured creditors are required
8  every 120 days. Plan, ¶ IV-D. Disbursements are to be made
9  quarterly, beginning January 1, 2012, and ending September 1,
10  2018. Plan, ¶ II-C-3.

11     The absence in the Plan of the word "trust" is not
12  dispositive. The Revested Debtors as Disbursing Agent were
13  required to calculate and disburse actual disposable income,
14  which was dedicated to the exclusive benefit of the Class V
15  unsecured creditors up to the amounts of their claims. As was
16  the case in <u>Consolidated Pioneer</u>, it follows the these duties
17  were fiduciary in nature. <u>Consolidated Pioneer</u>, 264 F.3d at 808
18  (applying California Law).

19     It follows that the terms of this Plan saddled the Revested
20  Debtors with the trust-law duty of a fiduciary to account to the
21  Plan Class V beneficiaries for actual disposable income.

22

23                                  B

24     In the alternative, if the Revested Debtor is not deemed to
25  be subject to a fiduciary duty to account to the Plan Class V
26  unsecured creditors, he nevertheless has a contractual duty to
27  account that follows from the role as disbursing agent for actual
28  disposable income owing to the Class V creditors.

C

It is not material that the requisite frequency of reports is uncertain.  Regardless of whether the duty to report is a fiduciary or contractual duty, it is either quarterly to match the prescribed Class V disbursement interval or 120 days to match the 120-Plan Report requirement.  Either way, no report was made during the final 48 months of the Plan.

IV

The Revested Debtors' defense relies on the fallacious premise that the movant Class V unsecured creditor has the burden of persuasion in all respects.  In the end, however, the Revested Debtors have the determinative burden of persuasion.[25]

A

Basic principles of fiduciary law allocate the burden to render an accounting on the fiduciary once it is shown that funds have been entrusted to the fiduciary and not paid over or otherwise accounted for.  <u>Niles</u>, 106 F.3d at 1462.

The Revested Debtors know what funds they received and how they applied them.  The Class V creditors have no independent knowledge of those facts and would have to pry the necessary information out of the Revested Debtors in order to determine actual disposable income.  It is appropriate to allocate the

---

[25]Fed. R. Evid. 301; 21B CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & KENNETH W. GRAHAM, JR., FEDERAL PRACTICE AND PROCEDURE: EVIDENCE § 5122 (2d ed. 2020)(burdens of production, persuasion, and proof).

burden to the Revested Debtors as being better positioned to produce the requisite proof.  <u>Niles</u>, 106 F.3d at 1462.

Similarly, substantive policies behind both fiduciary law and agency law favor requiring fiduciaries and agents to perform their obligations faithfully and with care.  <u>Niles</u>, 106 F.3d at 1462, <u>citing</u> RESTATEMENT (SECOND) OF TRUSTS § 172 (duty to render accounts) <u>and</u> RESTATEMENT (SECOND) OF AGENCY § 382 (same).

The movant Class V creditor has satisfied its burden of production by establishing that the Revested Debtors are in a fiduciary position.  The burden then shifted to the Revested Debtors to persuade the trier of fact that they complied with their fiduciary duties to account.  The correlative risk of nonpersuasion reposes on the Revested Debtors.  This trier of fact is not persuaded.

B

The contract analysis is complicated by related reciprocal burdens.

1

As a matter of conventional contract law, the movant Class V creditor, as the party seeking conversion or dismissal of the chapter 11 case on a theory of material default with respect to the confirmed Plan under § 1112(b)(4)(N), ordinarily has the burden to demonstrate that it was a Plan default never to disburse promised actual disposable income to Class V creditors.

Once a prima facie case has been made, the burden of production then shifts to the Revested Debtors to come forward

1   with evidence to the contrary.  If they do so, then the movant

2   ordinarily bears the ultimate burden of persuasion of material

3   default and the correlative risk of nonpersuasion.

4

5                                 2

6        But, when the chapter 11 debtor is an individual, the

7   picture is clouded by the debtor's reciprocal obligation to prove

8   completion of all payments under the plan as a condition of

9   receiving a discharge.

10        The Plan provides that there will be no discharge for debts

11  incurred before confirmation until completion of all payments

12  under the Plan.  Plan, ¶ IV-A.

13        That Plan provision comports with the general rule of

14  Bankruptcy Code § 1141(d)(5) that an individual debtor does not

15  receive a discharge until completion of all payments under the

16  Plan unless the court orders otherwise for cause.  11 U.S.C.

17  § 1141(d)(5)(A).

18

19                                 a

20        Therein lies the rub.  In order to obtain a discharge, the

21  Revested Debtors have the § 1141(d)(5)(A) burden to demonstrate

22  completion of all payments under the Plan.  That burden requires

23  them to prove (i.e. persuade) that there never was actual

24  disposable income during the 84 months of the Plan.

25        At this stage of a chapter 11 case, one cannot ignore the

26  discharge question.  No discharge would mean that all original

27  debts remain owed with interest and that the Plan operated as an

28  84-month shield against collections that could now be resumed.

1   When, not if, a discharge is requested, the Revested Debtors
2   will have the burden of persuasion on the question whether they
3   have completed all payments under the Plan.  Fulfilling that
4   burden requires them to make an accounting essentially identical
5   to that which is required of a fiduciary.
6   Hence, the question of material default on a theory of
7   nonpayment presented by the movant Class V creditor and the
8   question of completion of payments under the Plan for purposes of
9   discharge are reciprocal and inextricably intertwined issues.
10
11   b
12   A ruling in the creditor's action that the Revested Debtors
13   are in material default for not having made required plan
14   payments likely would be issue preclusive of the Debtors'
15   entitlement to discharge on which they have the burden of proof.
16   The Revested Debtors' defense in this case is that they made
17   all required Plan payments to Class V, to wit, none — because
18   there never was disposable income.  And, in a request for entry
19   of discharge, that is what they would have the affirmative burden
20   to prove by way of an accounting.
21   This situation, then, is more than a shifting burden of
22   production.  The creditor's showing of prima facie case on the
23   question of nonpayment could be fatally issue preclusive to the
24   Debtors' ability to obtain a discharge and shifts the ultimate
25   burden of persuasion to the Debtors to show that there never was
26   actual disposable income during the 84-month period of the Plan.
27
28

25

3

Regardless of whether the Revested Debtors saddled themselves with fiduciary duties to account when they assumed the role of disbursing agent for plan payments, they certainly have a contractual duty to account for their income from all sources during the 84 months of the Plan.

V

The evidence adduced at trial does not favor the position of the Revested Debtors that there never was "disposable income" and that the duties under the Plan were otherwise performed.

This trier of fact did not believe the testimony of Umesh Patel attempting to explain his finances during the 84-month Plan period.  His testimony that he received loans from Kirki Patel and James Macko is unsubstantiated and not believed.  Nor is the analysis by his expert, Norman Johnson, persuasive.  In contrast, movant's expert J. Michael Issa was more helpful.

Under any view of the evidence and under any construction of the Plan, motel operations in 2015, 2016, and 2017 yielded, at a minimum, profits of $98,121 that qualified as actual disposable income required to be disbursed to Class V unsecured creditors. The failure to disburse was a Plan default.

The Revested Debtors had a continuing duty to account for the full 84 months of the Plan, but provided neither accounting nor report for any of the final 48 months of the Plan.  This was a Plan default.

The Revested Debtors had income from sources other than motel operations but did not account for such income during any

month of the Plan, even though the definition of "disposable income" that they prescribed in the Plan includes income from "all sources."  This was a Plan default.

The Revested Debtors departed from the announced business plan to branch out into trading in securities options and margin accounts without notifying or accounting to the Class V creditors.  The magnitude of this activity is material.  Evidence of one account in Plan month 28 (January 2014) shows credits of $112,206.05 and debits of $66,551.43.  Another account in Plan month 83 (August 2018) reflects year-to-date securities purchases of $2,627,970.74 and sales of $2,912,589.66.  Umesh Patel and his expert concede that stock market losses between 2011 and 2018 were between $339,000 and $372,800.

In order to engage in such trading, the source funds must have either been derived from the motel operations that Umesh Patel said was his sole source of income or from undisclosed sources of income, which nevertheless were required to be counted in the "disposable income" calculation.  Diverting funds that should have been considered for disbursement to Class V creditors, without notice to those creditors, in order to gamble in the casino games of stock options and stock investments on margin is a Plan default.

The funding by Umesh Patel of $50,000 in a Roth IRA came from funds that constituted disposable income.

The $60,000 of gold and diamond jewelry that Umesh Patel claimed was stolen from him by Suhkwinder Patel in 2017 has no identifiable source in the record.  Two plausible alternative explanations are that this personal property was acquired with

disposable income by way of a Plan default or that Umesh Patel perjured himself at the outset of the case.

The fact that Umesh Patel had the financial wherewithal to make a $11,023.50 down payment on the purchase a new $71,049.50 Tesla automobile ten days after the nominal expiration of the 84-month plan, warrants the inference that the source of that $11,023.50 payment was from income attributable to a time during the 84-month plan period.  Not disbursing such funds to Class V unsecured creditors was a Plan default.

VI

Each of the identified Plan defaults is a material default with respect to a confirmed plan that provides cause within the meaning of § 1112(b)(4)(N) to convert or dismiss the case.  11 U.S.C. § 1112(b)(4)(N).[26]

The requisite standard is "whichever is in the best interests of creditors and the estate."  11 U.S.C. § 1112(b)(1).

The movant creditor contends that conversion, rather than dismissal is in the best interest of creditors and the estate.

This court agrees that conversion is in the interest of creditors and the estate.

---

[26]In making this determination, the court has ignored the failure to pay the $951,214.63 balloon Plan payment due to 1332 Broadway Note, LLC, on September 1, 2018.  There is a pending adversary proceeding by Umesh Patel against 1332 Broadway Note, LLC, contending that it sabotaged Patel's efforts to refinance the motel.  That cause of action, as to the merits of which this court expresses no view, is property of the estate that the Chapter 7 trustee will be able to assess.

Dismissal would place all parties in interest back to the 2009 status quo in 2020. Too much water has gone over the dam since then to perpetuate the case in chapter 11.

The Plan specifically contemplates the possibility of conversion to chapter 7 for default and clarifies what will constitute property of the estate following conversion and the status of the automatic stay.

While the interests of the Debtors are not directly included in the § 1112(b) standard, which focuses on interests of creditors and the estate, it is noted that after conversion the Debtors, in principle, could salvage a chapter 7 discharge.

The court is mindful that it has discretion to determine that appointment under § 1104(a) of a trustee or examiner is in the best interests of creditors and the estate. 11 U.S.C. § 1112(b)(1). That alternative would not be efficacious in view of the history of this case.[27]

Successful liquidation in this case may involve selling the motel as a going concern. To facilitate that possibility without harming employees, it is appropriate for this court to exercise its discretion under § 721 to authorize the chapter 7 trustee to operate the business for 90 days after conversion if, in the business judgment of the trustee, such operation is in the best interest of the estate and consistent with orderly liquidation of the estate. 11 U.S.C. § 721.

---

[27]Rule 1019 governs conversion from chapter 11 to chapter 7 at any stage of the case, including after plan confirmation. Fed. R. Bankr. P. 1019. The conversion order will provide that any request for this court to exercise its Rule 1019 authority to order or direct "otherwise" shall be by separate motion.

1

<u>Conclusion</u>

2     There being multiple material defaults in the confirmed plan

3 and the best interests of creditors and the estate favoring

4 conversion to chapter 7, the case will be ordered converted to

5 chapter 7 pursuant to 11 U.S.C. §§ 1112(b)(1) and (b)(4)(N).

6     An appropriate order will issue.

7

8 Dated: October 15, 2020

9

10

11                        United States Bankruptcy Judge

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28